Nathan B. Piller (SBN 300569)
Frank J. White Jr. (SBN 345157)
SCHNEIDER WALLACE
COTTRELL KONECKY LLP
2000 Powell Street, Suite 1400
Emeryville, California 94608
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
npiller@schneiderwallace.com
fwhite@schneiderwallace.com

*Attorneys for Plaintiffs and the Putative Class*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS FISCHER, BRIAN BLAIR and MARGARET BLAZIC, on behalf of themselves and all others similarly situated; | Case No.  3:25-cv-02232-VC |
| | (Removed from Napa Superior Ct, Case No. 24CV002217) |
| Plaintiffs, | |
| | **CLASS ACTION COMPLAINT:** |
| vs. | (1) Failure to Pay for All Hours Worked (Labor Code § 204); |
| | (2) Failure to Pay Minimum Wages (Labor Code §§ 1182.11, 1182.12, 1194, 1197, and 1197.1); |
| SWIFT TRANSPORTATION CO. OF ARIZONA, LLC; | (3) Failure to Provide Timely and Accurate Itemized Wage Statements (Labor Code § 226, 226.3 and 226.6); |
| Defendant, | (4) Waiting Time Penalties (Cal. Lab. Code §§ 201-203); |
| | (5) Unlawful Business Practices (Cal. Bus. & Prof. Code §§ 17200 *et seq.*) |
| | **DEMAND FOR JURY TRIAL** |
| | Complaint Filed: December 13, 2024 Trial Date: None Set |

Plaintiffs Thomas Fischer, Brian Blair and Margaret Blazic ("Plaintiffs") bring this action on behalf of themselves, and all others similarly situated against Swift Transportation Co. of Arizona, LLC and any subsidiaries or affiliated companies (hereinafter, collectively referred to as "Swift" or "Defendants"), and allege as follows:

## **INTRODUCTION**

1.      This is a class action on behalf of Plaintiffs and numerous other similarly situated individuals who Swift Transportation Co. of Arizona, LLC has employed in California as W-2 truck driver employees at any time four years prior to the filing of this Complaint until the date of the class notice.

2.      The Class Members (also referred to herein as "Drivers") work away from home for days and often weeks on end hauling freight in long-haul semis for the benefit of their employer.  Yet, as their employer, Swift has imposed and continues to impose a series of policies on the Drivers that systematically deny them minimum wage for large swaths of time during which they are subject to employer-control.  As further explained herein, the Class Members are entitled to wage compensation for this time under California state law.

3.      The specific categories of compensable time for which Swift has systemically and unlawfully failed to pay its Drivers include:

* Uncompensated time subject to Hight Theft Area Policies:  Swift requires and/or suffers and permits the Drivers to log themselves as off duty for purposes of wage compensation when they are parked in a "High Theft Area." At the same time, Swift regularly prohibits the Drivers from leaving their loads unattended during this time. Because Swift restricts the Drivers' freedom to leave their vehicle while parked in a High Theft Area, Swift must pay the Drivers for this time to comply with California law. However, Swift regularly fails to pay the Drivers any wages for this time on the basis that it is logged as "off duty."

* Uncompensated time subject to Hight Value Load Policies:  Swift requires and/or suffers and permits Drivers to log themselves as off duty for purposes of wage compensation when they are parked with a "High Value Load" in their trailer.  At the

same time, Swift regularly prohibits the Drivers from leaving their loads unattended during this time. Because Swift restricts the Drivers' freedom to leave their vehicle while parked with a High Value Load, Swift must pay the Drivers for this time to comply with California law. However, Swift regularly fails to pay the Drivers any wages for this time on the basis that it is logged as "off duty."

*Uncompensated time subject to Swift's policy prohibiting loads from being left unattended at customer locations: Swift requires and/or suffers and permits the Drivers to log their time as off duty for purposes of wage compensation while they are with a loaded trailer at a customer location. At the same time, Swift regularly prohibits the Drivers from leaving their loads unattended during this time. Because Swift restricts the Drivers' freedom to leave their vehicle while parked at a customer location with a loaded trailer, Swift must pay the Drivers for this time to comply with California law. However, Swift regularly fails to pay the Drivers any wages for this time on the basis that it is logged as "off duty."

*Uncompensated "detention time" while required to wait at customer sites: Swift requires and/or suffers and permits the Drivers to log their time as off duty for purposes of wage compensation while they are required to wait at Swift's customer locations, beyond the scheduled pickup or drop-off time, for Swift's customers to take possession of the loads they are dropping off and/or to receive a new load to transport away from the customer site. Swift denies Drivers any compensation for the first 2 hours of this "detention time" and then caps total detention pay at $96, even though the duration of the detention is regularly so long that $96 does not meet minimum wage requirements.

* Uncompensated breakdown time: It is common for Swift's trucks to experience breakdowns while the Drivers are out with them on the road for days or weeks at a time. During these breakdowns, the Drivers are stranded and must stay with the vehicle and trailer for many hours to wait for a repair team from Swift to come fix the vehicle or bring them to a new location. Remarkably, Swift's policy is to pay the Drivers only $50

per 24-hour increment of this required wait time.  This compensation structure falls well below California's applicable minimum wage.

* <u>Uncompensated Layover Time</u>:  It is common for Drivers to experience other logistical and scheduling delays caused by Swift's operations, which although beyond the control of the Drivers, nonetheless compel the Drivers to wait at a location for an extended period of time for a load to be made available. Swift's policy is to pay the Drivers only $50 per 24-hour increment of this required wait time. This compensation structure falls well below California's applicable minimum wage.

4.      It is well documented that truck drivers like Swift's must endure "long hours and uncomfortable working conditions." *See* New York Times, "The Biggest Kink in America's Supply Chain: Not Enough Truckers", November 9, 2021 (available at https://www.nytimes.com/2021/11/09/us/politics/trucker-shortage-supply-chain.html?searchResultPosition=1); New York Times, "The Real Reason America Doesn't Have Enough Truck Drivers," February 9, 2022 (available at https://www.nytimes.com/2022/02/09/business/truck-driver-shortage.html).

5.      Indeed, Swift's Drivers remain at the service of their employer around the clock, for days and weeks at a time, picking up, dropping off, and transporting loads.  Further, the Department of Transportation (DOT) has observed that truck drivers like Swift's "work some of the longest hours known in this country." *See* Notice of Proposed Rulemaking; Request for Comments, Department of Transportation, Federal Motor Carrier Safety Administration, Hours of Service of Drivers; Driver Rest and Sleep for Safe Operations, 2000 WL 517560, 65 FR 25540-01, at 25548.

6.      During their extended time on the road and away from home, Swift's Drivers spend as many as 14 hours per day driving the truck and performing various non-driving tasks, such as conducting pre- and post-trip inspections, fueling the vehicles, having their vehicles weighed at scaling stations, and being subject to inspection by DOT officers, among other things.

7.      Swift's Drivers also spend significant additional time on a daily basis when they are not able to perform productive work, but when they are nonetheless subject to Swift's control

1    and are therefore entitled to compensation for their wait time under applicable law.  However, by

2    misusing the DOT Regulations to determine when its Drivers are entitled to compensation and

3    when they are not, Swift has systematically and unlawfully denied the Drivers compensation for

4    these large segments of compensable time.

5           8.     Under the applicable DOT Regulations, the Drivers must log their time in an

6    electronic logging device kept in the cab of the vehicle.  The Drivers are supposed to log time

7    spent driving the vehicle in a "duty status" called "Driving."  They also are supposed to log the

8    time spent doing productive non-driving work (such as inspections and the like) and/or being in a

9    "readiness to work" state, in a "duty status" called "On-duty, not driving."

10           9.     Swift's policy is to use a piece rate formula to compensate the Drivers for the

11    time spent logged in the duty statuses of "Driving" and "On-duty not driving."  However, there

12    are two other duty statuses for which Swift does not compensate the Drivers at all: "Off-duty"

13    and "Sleeper berth."

14          10.    Under the DOT regulations, Drivers must log at least 10 consecutive hours as

15    "Off duty" and/or "Sleeper berth," after they reach 11 hours of time in the "Driving" duty status

16    and/or 14 hours of time in a combination of the "Driving" and "On duty, not driving" duty

17    statuses.  Swift instructs the Drivers to comply with these "Off duty" and "Sleeper berth" logging

18    requirements or be subject to discipline, up to and including termination of employment.

19          11.    At the same time, Swift knows that the Drivers regularly run up against their 11-

20    hour and 14-hour DOT clocks when they are in a High Theft Area and/or with a High Value

21    Load, and that they must therefore log such time as "Off duty" and/or "Sleeper berth" to comply

22    with the DOT Regulations and Swift's own policies.  Under the rules, the Drivers can neither

23    "work" nor be in a "readiness to work" state when they have reached these limits, and therefore

24    have no choice but to log themselves as either "Off duty" or "Sleeper berth."  Yet, Swift refuses

25    to pay the Drivers any wages for this time (on the grounds that it is logged as "Off duty" or

26    "Sleeper Berth"), even though Swift also subjects the Drivers to its control during this same time

27    (for example, by prohibiting them from leaving the loads unattended).

28

12.     Similarly, Swift requires, encourages and/or suffers and permits the Drivers to log their time waiting at customer locations, during breakdowns, and during layovers, as "Off duty" and/or "Sleeper berth."  The purpose of logging in this manner is to help ensure that the Drivers conserve the maximum 14-hours of "Driving" and/or "On duty not driving" time allowed before needing to go off duty for 10 consecutive hours before driving again.  This in turn permits the Drivers to meet Swift's on-time delivery requirements and fully earn their piece rate wage.  Furthermore, when Drivers run up against their 14-hour clock while at a breakdown, layover or customer site, they have no choice but to log the time as "Off duty" and/or "Sleeper berth" to comply with the DOT Regulations and Swift's explicit policies.

13.     Yet, as described herein, the Drivers are not free to use their time at customer sites, during breakdowns, and at layovers, effectively for their own purposes.  Despite the Drivers' lack of freedom during their time waiting time at customer sites, during breakdowns, and during layovers, Swift compensates them at less than minimum wage, through the detention pay, breakdown pay, and layover pay policies described herein.

14.     Empirical research documents how mileage-based pay systems like Swift's are linked to suppressed wages because of the reality that Drivers must spend extensive time subject to the employer's control when not driving or performing other productive work that generates piece rate units or other forms of compensation. *See* Karen Levy, *Data Driven: Truckers, Technology, and the New Workplace Surveillance*, 24 (2023); Michael H. Belzer, *Sweatshops on Wheels: Winners and Losers in Trucking Deregulation*, 137-155 (Oxford University Press, 2000); Steve Viscelli, *The Big Rig: Trucking and the Decline of the American Dream*, 75-100 (University of California Press, 2016); M Belzer, "The economics of long work hours: how economic incentives influence workplace practice," Industrial Health (2020), 58, 299-402, at 400.

15.     Plaintiffs Thomas Fischer, Brian Blair and Margaret Blazic worked for Swift as W-2 employee truck drivers in California.  They each went on multi-day tours of duty hauling freight for Swift as part of their regular job duties.  Like the other Swift Drivers, Swift denied Plaintiffs minimum wage compensation, or any compensation altogether, for large swaths of

1    time they had to spend subject to the control of Swift, including the specific categories of time

2    described herein.

3        16.    Plaintiffs bring this case to address Defendants' systematic denial of minimum

4    wage, among other violations.  Plaintiffs state claims under California Labor Code; California

5    Department of Industrial Relations, Industrial Welfare Commission (IWC) Wage Orders; and

6    California's Unfair Competition Law (UCL).

7    **PARTIES**

8        17.    Plaintiffs and the Class members are current and former employees of Swift in

9    California who worked as non-exempt Drivers during the time period four years before the filing

10   of this complaint, through resolution of this action.

11       18.    Plaintiff Thomas Fischer was a resident of California during his employment with

12   Swift.  Plaintiff Fischer was based out of a work location in this County during his employment

13   with Swift.  Plaintiff Fischer worked as an over-the-road truck driver for Defendants from

14   approximately February 2014 to June 2021 and logged unpaid time as "Off duty" and "Sleeper

15   berth" on his DOT logs, while subject to Swift's restrictive policies, in this County and

16   elsewhere in California, during the applicable time period.

17       19.    Plaintiff Margaret Blazic is, and has been, a resident of California during the

18   relevant time period.  Plaintiff Blazic worked as Driver for Swift from approximately August

19   2020 to September 2021.  Plaintiff Blazic logged unpaid time as "Off duty" and "Sleeper berth"

20   on her DOT logs while subject to Swift's restrictive policies, while in California, during the

21   applicable time period.

22       20.    Plaintiff Brian Blair is, and has been, a resident of California during the relevant

23   time period.  Plaintiff Blair worked as Driver for Swift from approximately February 2018 to

24   February 2021.  Plaintiff Blair logged unpaid time as "Off duty" and "Sleeper berth" on his DOT

25   logs while subject to Swift's restrictive policies, while in California, during the applicable time

26   period.

27

28

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
*Fischer, et al. v. Swift Transportation Co. of Arizona, LLC, et al.*

21.     Defendant Swift Transportation Co. of Arizona, LLC is a corporation that does business in the states of California, and nationwide, and at all relevant times has been engaged in the business of trucking in California, including in this Judicial District.

22.     At all relevant times, Defendant Swift Transportation Co. of Arizona, LLC has done business under the laws of California, has had places of business in California, and has employed Class members in this Judicial District.  Defendant Swift Transportation Co. of Arizona, LLC is an "employer" within the meaning of the California Labor Code and IWC Wage Orders.

## JURISDICTION AND VENUE

23.     The Court has jurisdiction under 28 U.S.C. § 1332(a)(1), because the amount in controversy in this action exceeds $75,000, exclusive of interests and costs, and because the parties are residents of different states.

24.     The Court has jurisdiction over Defendant Swift Transportation Co. of Arizona LLC because it is a business authorized to do business in the State of California and is registered with the California Secretary of State. Defendant Swift Transportation Co. of Arizona LLC does sufficient business with sufficient minimum contacts in California, and/or otherwise intentionally avail themselves of the California market through the advertising, marketing and sale of goods and services, to render the exercise of jurisdiction over Defendant Swift Transportation Co. of Arizona LLC by the California court consistent with traditional notions of fair play and substantial justice.

25.     Venue is proper under 28 U.S.C. §1391, because Defendant Swift Transportation Co. of Arizona LLC employs Class members and transacts business in this Judicial District, a substantial part of the acts and/or omissions giving rise to the claims occurred in this Judicial District, and Defendant Swift Transportation Co. of Arizona LLC has places of business in this Judicial District.

## FACTUAL ALLEGATIONS

26.     Swift is a truckload motor shipping carrier operating more than 23,000 trucks. It is the largest common carrier in the United States and had revenue of more than $7 billion in

2023.

27.    Swift has employed Plaintiffs and thousands of other truck drivers to perform work in the State of California, while being based out of a work location in California.

28.    Drivers go from one load assignment to the next and transport multiple loads, often for days or weeks at a time, before going home.

29.    During their tours of duty, the Drivers live on the truck and attempt to rest in the truck's cramped "sleeper berth." The sleeper berth is a small space with a bunk bed in the truck's cab. It does not have a bathroom or a sink.

30.    Drivers may work in both "over-the-road" and "dedicated" capacities, and may switch between the two during their employment. Over-the-road work entails hauling fright on routes for different customers, whereas dedicated work entails hauling freight for a single customer.  Both types of work require Drivers to be out on the road away from home for days or weeks at a time, and entail using a truck equipped with a sleeper berth.

31.    Drivers must log their time pursuant to "hours of service" regulations promulgated by the Department of Transportation ("DOT"). 49 C.F.R. § 395.8.  Swift provides the same procedure for recording DOT hours of service to all Drivers.

32.    The DOT logs are the only mechanism Swift has for recording Drivers' time. Swift maintains no time records other than the DOT logs.

33.    The Drivers' time is logged in the truck's electronic system during each hour of every 24-hour period as one of either: "Driving," "On-duty, not driving," "Off-duty," or "Sleeper berth."

34.    Swift's policy is to pay only for time spent in the "Driving" and "On duty, not driving" duty statuses, primarily through a per-mile piece rate.  Swift does not pay Drivers for any time logged as "Off duty" or "Sleeper berth" even though, as described herein, Swift's policies also require that the Drivers remain tethered to the immediate area of the truck and/or its cramped sleeper berth when logged in these designations during large swaths of time, including when they are in High Theft Areas, are carrying a High Value Load, are with a loaded trailer at a customer site, are waiting while detained at a customer site, are stranded during a breakdown,

and are waiting for Swift to arrange their logistics during a layover.

35.    There are a host of reasons related to routing, safety, DOT Regulations, customer concerns and other circumstances that compel Drivers to stop driving and log themselves into an "Off duty" and/or "Sleeper berth" duty status.  Drivers have little or any control over most of them.

36.    For instance, the DOT's "hours of service" safety regulations require Drivers to stop the truck for safety purposes and log a mandatory non-driving period of at least 10 hours once they reach daily limits on drive and other work time. Under the regulations, Drivers who have already been logged as "Driving" for 11 hours, or after being logged as "On duty, not driving" or "Driving" for 14 hours, must log at least 10 consecutive hours as "Off duty" or "Sleeper berth" to "reset" their clock before driving again.  Swift directs its Drivers to comply with this 10-hour reset rule.

37.    Although Swift does not pay Drivers at all—not even minimum wage—for time logged as "Off duty" or "Sleeper berth," its common operational policies restrict the Drivers' freedom of movement and activity during much of this time.

38.    "High Theft Areas": Swift's written policies direct Drivers "not [to] drop or leave unattended [a loaded trailer] for any reason (this includes being checked into a hotel[,])"  and "[n]ever leave any loaded trailer unattended" while in a designated "High Theft Area."  The policies go on to specify that "the driver must remain in the truck" and "must keep a visual on the load at all times (reasonable exceptions include short periods for using the facilities on the property where the driver is parked for restroom, shower and to eat)." Swift's standard trainings admonish Drivers that "no load, regardless of value, can be left unattended in company designated high-theft areas."

39.    Swift's designated "High Theft Areas" include one which encompasses a large section of California.

40.    "High Value Loads": Swift's written policies provide that the exact same restrictions described above apply to company-designated "High Value" loads, whether or not the area is designated as "High Theft."  For instance, Swift's policies state: "Do not drop or leave

1    unattended for any reason (this includes being checked into a hotel), the driver must remain in

2    the truck"; "prohibited conduct" includes "[f]ailure to maintain visual contact at all times with

3    any HIGH VALUE load trailer"; "Never leave a high value load unattended."

4        41.    Swift only allows Drivers to leave "High Value" loads or other loads in "High

5    Theft Areas" unattended when parked at a designated "Swift secured drop yard or terminal

6    location."  Yet, Drivers are required to stop the truck when they reach their daily limits of drive

7    time, whether or not they are near a designated "Swift secured drop yard or terminal location."

8    When Drivers are in a company-designated "High Theft Area" and/or with a "High Value Load"

9    and are running up against their daily limit of "Driving" and "On duty" hours, they need to stop

10   the truck and log themselves as "Off duty" or "Sleeper berth" pursuant to DOT Regulations and

11   Swift's policy.  When this occurs, they have no choice but to stop where they are and remain

12   with the load—even if they are in a "High Theft Area" and/or not in a designated "Swift secured

13   drop yard or terminal location." Under Swift's uniform policies, this time is unpaid.

14       42.    Customer Locations: Swift's Driver Handbook states: "No load is allowed to be

15   dropped or left unattended at any receiver location" or at "any location after a loaded call has

16   been completed." Thus, Drivers who are with a load at a customer location before the customer

17   takes possession of it are prohibited from leaving the truck unattended. Similarly, Drivers who

18   have taken possession of a load at a customer location cannot leave the load unattended while

19   they are at the customer location.

20       43.    None of Swift's written policies, training or any other Driver-facing materials

21   direct Drivers to record time on their DOT logs that is subject to the foregoing restrictions as

22   "On duty." Rather, Swift directs its employees to log time as "On duty" only if they are working

23   or in a readiness to work state as those terms are defined by the DOT.  Given the nature of

24   Swift's operations, however, Drivers regularly need to spend large segments of their time subject

25   to restrictions by Swift, even though they are not working or in a readiness to work state during

26   this time.  Moreover, if this time occurs when the drivers reach the maximum "On duty" hours in

27   a day permitted by the DOT's Hours of Service Regulations, the drivers are actually prohibited

28   by law and Swift's policies from working or being in a readiness to work state when they are

subject to the employer-restrictions.   This puts the drivers in the position of having their

freedoms restrained by their employer while at the same time being required by their employer's

policies to log the time as "Off duty" or "Sleeper berth."

44.    Drivers do not control when they must log time as "Off duty" or "Sleeper berth"

pursuant to DOT Regulations. If a Driver is with a load in a "High Theft Area," with a "High

Value Load," and/or with a load a customer location, and needs to be logged as "Off duty" or

"Sleeper berth" pursuant to DOT Regulations, they must follow DOT Regulations.

45.    Violation of the foregoing policies triggers Swift's progressive discipline policy.

Swift requires Drivers to sign documents saying that they will agree to follow all the company's

rules, policies, and standards, as set forth in its standardized Driver Handbooks. Swift maintains

a progressive discipline policy ("Performance Improvement Process") whereby Swift will

counsel Drivers who do not meet the company's "high standards." Under this policy, "[i]f the

driver's conduct or job performance does not improve, the process will generally progress to

more serious steps, up to and including termination of employment." Swift maintains a list of

"Prohibited Conduct" that "will not be tolerated by Swift and may lead to immediate termination

of employment." The prohibited conduct includes, *inter alia*, "failing to maintain visual contact

at all times with any HIGH VALUE load trailer"; and "Violations of the Hours of Service

regulations," which contain the requirement to stop the truck and log 10 consecutive hours as

"Off duty" or "Sleeper berth" after reaching 11 hours of driving or 14 hours of driving and/or on

duty time.

46.    This time during which the Drivers are prohibited from leaving the load

unattended is compensable.  Under California law, time during which employees are subject to

the control of the employer and unable to use the time effectively for their own purposes is

compensable. *Morrillion v. Royal Packing Co*. (2000) 22 Cal. 4th 575, 582.  In this connection,

"an employee who is subject to an employer's control does not have to be working during that

time to be compensated." *Id*.  Rather, "control may exist even when employees are permitted to

perform personal activities if the employer imposes meaningful restrictions on the employee…

the question of control boils down to whether the employee may use break or non-work time

however he or she would like." *Ridgeway v. Walmart Inc.* (9th Cir. 2020) 946 F.3d 1066, 1079 (citing *Augustus v. ABM Sec. Servs., Inc*. (2016) 2 Cal. 5th 257, 268, 211 and *Mendiola v. CPS Sec. Sols., Inc.* (2015) 60 Cal. 4th 833, 840.

47.    Restrictions on employees' freedom of movement are a classic example of employer control over non-work time. *See Mendiola*, 60 Cal. 4th at 840 ("When an employer directs, commands or restrains an employee from leaving the work place and thus prevents the employee from using the time effectively for his or her own purposes, that employee remains subject to the employer's control.").

48.    In addition, for employees compensated on a per-mile or other piece-rate basis, such as the Drivers here, California law requires that "nonproductive time" subject to the employer's control be compensated separately from any piece-rate compensation. Cal Lab Code § 226.2.  Thus, California law bars Swift from borrowing from its per-mile piece rate compensation and/or any other compensation paid for completing productive work tasks, to satisfy its obligation to pay wages for the "nonproductive" time at issue here.

49.    Notwithstanding the foregoing, Swift subjects Drivers to its control during time spent subject to the foregoing restrictions, while logged as "Off duty" or "Sleeper berth," but categorically denies the Drivers' any compensation—even minimum wage—for such time.

50.    Swift has attempted to justify its pay policies by arguing that they comply with the DOT "hours of service" regulations.  These regulations provide, *inter alia*, that employees should not perform work while logged as "Off duty" or "Sleeper berth."  But under California law, an employee "does not have to be working" for time to be compensable. *Morillon v. Royal Packing Co.* (2000) 22 Cal. 4th 575, 582.  Rather, employees can still be subject to an employer's control and entitled to compensation, even when logged as "Off duty" or "Sleeper berth" under DOT regulations and not performing work. *Ridgeway v. Walmart Inc.* (9th Cir. 2020) 946 F.3d 1066, 1077.

51.    Further, the "DOT Regulations [] have little or no bearing" on compensability of time logged as "Off duty" or "Sleeper berth." *Julian v. Swift Transp. Co.* (D. Ariz. 2018) 360 F. Supp. 3d 932, 943; *Browne v. P.A.M. Transp., Inc*. (W.D. Ark. Oct. 19, 2018) 2018 U.S. Dist.

1  LEXIS 180189, at *8; *Hubchak v. FedEx Ground Package Sys*. (S.D. Ill. July 31, 2019) 2019

2  U.S. Dist. LEXIS 127856, at *3-4. The DOT "Off duty" status does not equate to being "off

3  duty" for pay purposes.

4      52.    The Department of Labor (DOL) has emphasized (and the DOT has recognized)

5  that time during which an employee is considered on or off duty by the DOT is not governed by

6  the same principles as apply under the wage laws. The DOT's regulations are concerned

7  primarily with the safe operation of the vehicle and not compensable hours worked. Thus, the

8  off-duty time required by DOT for safety purposes exceeds the amount of non-working time that

9  may be deducted pursuant to wage laws.

10      53.    In addition to its operational policies prohibiting Drivers from leaving the load

11  unattended, Swift also maintains pay policies that explicitly deny Drivers minimum wage during

12  discrete periods of time when they have no practical means of leaving the area where the truck is

13  parked or otherwise using the time effectively for their own purposes:

14      54.    <u>Detention Time</u>: In the trucking industry, "detention" is time when a Driver is

15  required to wait for their trailer to be loaded or unloaded at a shipper's or a receiver's facility,

16  past the scheduled pickup or drop-off time.  During detention time, Drivers cannot leave the

17  customer location until they receive a new load at the customer site, or have their current load

18  dropped off.

19      55.    Swift's uniform policy is that when a "driver is detained at a customer location,"

20  they shall not receive any pay for the first two hours of such detention, and that any pay they

21  receive for the duration of the detention is maxed out at $96.  Thus, Swift denies Drivers any

22  compensation at all for the first 2 hours of time when they are detained at a customer location,

23  unable to leave, and in service of Swift, and then caps total detention pay at $96, even where the

24  duration of the detention is so long that $96 does not meet minimum wage requirements.

25      56.    Time when drivers are detained at a customer site is compensable because it is

26  subject to Swift's control and for Swift's benefit. The Drivers are not able to leave the area or

27  otherwise use the time effectively for their own purposes.  The time spent in detention also

28

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
*Fischer, et al. v. Swift Transportation Co. of Arizona, LLC, et al.*

1  serves Swift's interests because it ensures that the customer is able to receive the delivery or load

2  its freight onto the truck, in spite of the delay.

3      57.   <u>Breakdown Time</u>: When a Driver's truck breaks down and become inoperable,

4  the Driver is stranded wherever they had to stop the truck. During this time, Drivers must wait

5  for repairs to be completed. Because they are stranded wherever the truck broke down, they often

6  are far from either truck mechanics or places of amusement.  They also lack an alternative means

7  of transportation to leave the area and otherwise use the time effectively for their own purposes.

8      58.   When Drivers are stranded during a breakdown, Swift's uniform policy is to pay

9  them $50 per 24-hour increment of wait time. This, on its face, is below California's applicable

10  minimum wage.

11     59.   The Breakdown time is subject to Swift's control because the Drivers have no

12  practical means to leave the area where their truck is broken down or otherwise use the time

13  effectively for their own purposes.

14     60.   <u>Layover Time</u>: It is common for there to be delays or scheduling issues beyond

15  Drivers' control that compel them to wait at a location for an extended period of time for a load

16  to be made available.

17     61.   Swift's policy is to pay for Layover time when Drivers are "available to work"

18  but when "no load/work is available" at a rate of $50 per 24-hour increment. This, on its face, is

19  below California's applicable minimum wage.

20     62.   The Layover time is subject to Swift's control because Swift is controlling the

21  logistical arrangements for the loads with its customers, while the Drivers have no practical

22  means to leave the area or otherwise use the time effectively for their own purposes.  In fact, the

23  Drivers are engaged to be waiting at a specific location for their next assignment.

24     63.   Plaintiffs, Thomas Fischer, Brian Blair and Margaret Blazic, have each been

25  subject to the foregoing Swift policies and were denied wages as a result.  Plaintiffs bring a class

26  action on behalf of themselves and other similarly situated individuals who have worked as truck

27  drivers for Defendants in California at any time beginning four years before the filing of this

28  Complaint, through resolution of this action.

# CLASS ACTION ALLEGATIONS

64.     Plaintiffs re-allege and incorporate the foregoing paragraphs as though fully set forth herein.

65.     Plaintiffs bring this case as a class action on behalf of themselves and all others similarly situated pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and/or (b)(3).  The putative Class that Plaintiffs seek to represent is defined as follows:

> All current and former truck drivers of Swift Transportation Co. of Arizona, LLC, who have been based out of a work location in California and have driven for Swift in California at any time beginning four years prior to the filing of the original Complaint in this action until the date of class notice. ("the Class").

66.     Plaintiffs further seek to represent the following Subclasses within this broader Class:

A.  High Theft Area Subclass:  All members of the Class with time logged as "Off duty" and/or "Sleeper berth" while with a loaded trailer in a "High Theft Area" and not parked at a designated "Swift secured drop yard or terminal location."

B.  High Value Load Subclass:  All members of the Class with time logged as "Off duty" and/or "Sleeper berth" while carrying a "High Value Load" and not parked at a designated "Swift secured drop yard or terminal location."

C.  Customer Location Subclass: All members of the Class with time logged as "Off duty" and/or "Sleeper berth" while with a loaded at a customer location.

D.  Detention Subclass:  All members of the Class with time logged as "Off duty" and/or "Sleeper berth" while subject to Swift's Detention Pay Policy.

E.  Breakdown Subclass:  All members of the Class with time logged as "Off duty" and/or "Sleeper berth" during a breakdown and/or subject to Swift's Breakdown Pay Policy.

F.  Layover Subclass:  All members of the Class with time logged as "Off duty" and/or "Sleeper berth" during time spent in a layover and/or subject to Swift's Layover Pay Policy.

67.     This action has been brought and may properly be maintained as a class action

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
*Fischer, et al. v. Swift Transportation Co. of Arizona, LLC, et al.*

1  under Federal Rule of Civil Procedure 23.

2  .

3  a.  **Numerosity**: Defendants have employed thousands of Drivers in California from

4      December 2020 to the present.  The members of the Class and each Subclass are so

5      numerous that joinder of all the members of the Class and each Subclass is impracticable.

6      In addition, the members of the Class and each Subclass as defined herein can be by

7      identified through Defendant's Compensation Data, DOT hours of service data ("DOT

8      Log Data"), Loads Data and Macro Data, among other data, as further described below

9  b.  **Commonality:** There are questions of law and fact common to Plaintiffs and the Class

10     that predominate over any questions affecting only individual members of the putative

11     Class.  These common questions of law and fact include, but are not limited to:

12     i.   Whether Defendants' "High Value Load" policies subject Drivers to Defendants'

13          control during time logged as "Off duty" or "Sleeper berth";

14     ii.  Whether Defendants' "High Theft Area" policies subject Drivers to Defendants'

15          control during time logged as "Off duty" or "Sleeper berth";

16     iii. Whether Defendant' policy prohibiting Drivers from leaving loads unattended at

17          customer locations subjects Drivers to Defendants' control during time logged as

18          "Off duty" or "Sleeper berth";

19     iv.  Whether Drivers are subject to Defendants' control during customer detention

20          time;

21     v.   Whether Drivers are subject to Defendants' control during time awaiting service

22          following a truck breakdown;

23     vi.  Whether Drivers are subject to Defendants' control during layover time;

24     vii. Whether Defendants' policies prevent Drivers from being able to use time logged

25          as "Off duty" and "Sleeper berth" effectively for their own purposes;

26     viii. Whether Defendants owe the Drivers minimum wages in violation of the Cal.

27          Lab. Code and Wage Order 9;

28

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
*Fischer, et al. v. Swift Transportation Co. of Arizona, LLC, et al.*

     ix.    Whether Defendants owe the Drivers straight-time wages in violation of the Cal. Lab. Code and Wage Order 9;

     x.    Whether the paychecks provided to the Drivers in connection with their compensation accurately state all the required elements for itemized wage statements under California Labor Code Section 226(a);

     xi.    Whether Drivers who had their employment relationship with Defendants terminated are entitled to penalties for Defendants' failure to timely pay all outstanding amounts of compensation owed upon termination of the employment relationship;

     xii.    Whether Defendants' policies and practices have resulted in violation of one or more of the California Labor Code Provisions cited herein;

     xiii.    Whether Defendants' policies and practices are unlawful unfair business practices in violation of California Business & Professions Code Sections 17200, et seq.; and

     xiv.    The monetary relief to which the Class may be entitled as a result of the violations alleged herein.

c.    **Typicality:** Plaintiffs' claims are typical of the claims of the Class. Defendants' common course of conduct in denying the Drivers compensation for time logged as "Off duty": and "Sleeper berth" while subject to the foregoing restrictive policies has caused Plaintiffs and putative Class members to sustain the same or similar injuries and damages. Furthermore, inasmuch as Plaintiffs' individual claims under the California Labor Code are tolled by previous litigation, such claims are the same or similar to the class claims under the California Labor Code. Plaintiffs' claims are thereby representative of and co-extensive with the claims of the Putative Class.

d.    **Adequacy of Representation**: Plaintiffs are members of the putative Class, do not have any conflicts of interest with other putative Class members, and will prosecute the case vigorously on behalf of the putative Class. Plaintiffs are represented by counsel who has extensive experience in handling similar employment class actions and extensive

knowledge of applicable law, and who will fairly and adequately represent the interests of the putative class. Furthermore, inasmuch as Plaintiffs' individual claims under the California Labor Code are tolled by previous litigation, such claims are the same or similar to the class claims under the California Labor Code.  Counsel representing Plaintiffs is competent and experienced in litigating large employment class actions, including wage and hour cases.  Plaintiffs will fairly and adequately represent and protect the interests of the Class members.

e. **Predominance**: the common questions of law and/or fact described above predominate over any questions affecting only individual members because they can be decided for all putative class members based on common proof.

f. **Superiority of Class Action**: A class action is superior to other available means for the fair and efficient adjudication of this controversy.  Individual joinder of all putative Class members is not practicable, and questions of law and fact common to the putative Class predominate over any questions affecting only individual members of the putative Class. Each putative Class member has been damaged and is entitled to recovery by reason of Defendants' illegal policies and/or practices.  Class action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system.

g. **Appropriateness of Injunctive or Declaratory Relief**.  Final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole. Defendants have acted or refused to act on grounds that apply generally to the Class, such that final injunctive relief or corresponding declaratory relief may be properly applied to the Class as a whole

68.    The Class may also be certified because the prosecution of separate actions by the individual members of the putative Class would create a risk of inconsistent or varying adjudication with respect to individual members of the putative Class.

69.    If each individual Class member were required to file an individual lawsuit, Defendants would necessarily gain an unconscionable advantage because Defendants would be

1   able to exploit and overwhelm the limited resources of each member of the putative Class with

2   Defendants' vastly superior financial legal resources.

3       70.    Requiring each individual Class member to pursue an individual remedy would

4   also discourage the assertion of lawful claims by the Class members who would be disinclined to

5   pursue these claims against Defendants because of an appreciable and justifiable fear of

6   retaliation and permanent damage to their lives, careers, and well-being.

7                **SWIFT'S CLASS-WIDE DATA PINPOINT INJURY AND DAMAGES**

8       71.    Swift maintains "Macro Data," DOT Hours of Service data ("DOT Log Data"),

9   "Loads Data" and Compensation Data for the Class of Drivers alleged herein that can be

10  analyzed together to systematically identify the instances when Drivers were subject to the

11  restrictive policies described above while in an unpaid "Off duty" or "Sleeper berth" status.  This

12  class wide data can also be used to pinpoint the wages owed to the Drivers for unpaid time spent

13  in an "Off duty" and/or "Sleeper berth" designation while also subject to the "High Theft Area"

14  and "High Value Load" restrictions, as well as when subject to the detention pay, breakdown

15  pay, and layover pay policies.

16      72.    First, Swift maintains "Macro Data" on a class-wide basis showing not just the

17  date(s), but the precise times of day when the Drivers picked up and dropped off the loads.

18      73.    In fact, Swift's Driver Handbook states that Drivers are required to send "Macro"

19  communications via their electronic, in-cab communications systems "when loaded prior to

20  leaving the shippers location" and "from the final location when empty."

21      74.    The Handbook further states that the "Loaded Call" Macro "will need to be sent

22  by the Driver just prior to departure from the origin location of the load. The date and time this

23  Macro is sent will be used to update the load origin departure date and time status."

24      75.    Likewise, the Handbook states that the "Empty call" Macro "will need to be sent

25  by the Driver just prior to departure from the final destination location of the load. The date and

26  time that this Macro is sent will be used to update the final departure status date and time. This

27  Macro should be sent only after the trailer has been emptied at the final location."

28

---

76. In addition, Swift stated in its 2022 Annual Report to the Securities and Exchange Commission that its in-cab communication devices allow Swift to "obtain load position updates" and "provide our customers with freight visibility[.]"

77. In addition to the Macro Data, Swift's DOT Log Data show the date, time, duration, and location of each segment of time logged as "Off duty" or "Sleeper berth." Thus, each segment of unpaid time logged as "Off duty" or "Sleeper berth" can be specifically identified using Swift's DOT Log Data.

78. In turn, Swift's "Loads Data" for the Class shows the dates when loads were picked up or dropped off. The Loads Data also show whether a given load is designed as "High Value."

79. The Loads Data and DOT Log Data can be used together to pinpoint the segments of unpaid time the Drivers have logged as "Off duty" or "Sleeper berth" while with a loaded trailer and therefore subject to the "High Theft Area" and "High Value Load" restrictions.

80. <u>Middle-Day(s) of 3+ Day Loads</u>: One example of unpaid time that can be pinpointed by Swift's DOT Log Data and Loads Data is time spent in the middle day(s) of a 3+ day load. Specifically, any time Drivers are logged in the DOT Log Data as "Off-duty" or "Sleeper-berth" on a day (or days) in between the load pick-up day and load drop-off day shown in the Loads Data—*i.e.,* the middle-day(s) of a 3+ day load—corresponds to unpaid time during which the Drivers were subject to Swift's High Theft Area and High Value Load restrictions.

81. Based on information and belief, Plaintiffs allege that the DOT Log Data and Loads Data will show extensive hours of unpaid time logged as "Off duty" or "Sleeper berth" while subject to the "High Theft Area" and "High Value Load" restrictions, on just the middle-days of 3+ day loads.

82. <u>Unpaid Time Straddling Midnight</u>: Other examples of unpaid time that can be pinpointed by Swift's DOT Log Data and Load Data are (a) when a segment of "Off duty" or "Sleeper berth" time begins on the day that a multi-day load is picked up, and continues without interruption by any "On duty" segment until the next calendar day; and (b) a segment of "Off duty" or "Sleeper berth" time begins on the second-to-last day of a multi-day load and continues

without interruption by any "On duty" segment until the next calendar day, when the load is dropped off. It can reasonably be inferred that Drivers were with a loaded trailer during both these segments of time because Swift's policy and the DOT Regulations require the Drivers to log their time as "On duty" when their trailer is physically being loaded or unloaded.[1] Thus, if no "On duty" segment interrupts a period of "Off duty"/"Sleeper berth" time that crosses this midnight threshold, the Driver could not have dropped off the load until the next day.

83.    Drivers have a common work pattern of picking up a multi-day load, stopping in a "High Theft Area" outside of a designated secure location, and then logging their DOT-mandated "Off duty"/"Sleeper berth" time overnight, in a continuous period crossing the midnight threshold.

84.    Likewise, Drivers have a common pattern of logging their DOT-mandated "Off duty"/"Sleeper berth" time overnight, beginning on the second-to-last day of a load, and continuing uninterrupted until well into the next calendar day.

85.    On information and belief, Swift's DOT Log Data and Load Data will show extensive hours of this unpaid "Off duty" and "Sleeper berth" time in a High Theft area straddling the midnight threshold.

86.    As described above, Swift also maintains Macro Data that when used in conjunction with the DOT Log Data will pinpoint additional instances—indeed virtually all instances—during which a Driver was with a loaded trailer while subject to the High Value Load and High Theft Area policies.

87.    The DOT Log Data and Compensation Data can also be used to pinpoint all time Drivers were subject to the detention pay, breakdown pay, and layover pay policies, and were paid less than minimum wage for their time.

## PLAINTIFFS ARE ENTITLED TO PROVE ANY DAMAGES NOT SHOWN IN SWIFT'S RECORDS BY "JUST AND REASONABLE INFERENCE"

---

[1] DOT Regulations and Swift policy require that Drivers log time as "On duty" when their trailers are physically being loaded or unloaded, but not during other time when Drivers are at a customer site. For the remaining time at customer sites, Swift requires and/or suffers and permits the Drivers to be logged as "Off duty," including when subject to Swift's Detention Pay Policy.

88.     To the extent Swift's data do not show all segments of unpaid "Off duty" and "Sleeper berth" time subject to the "High Value Load" restrictions, "High Theft Area" restrictions, and/or other restrictions, then Swift failed to maintain complete and adequate records of all compensable work time. *See* Cal. Code Regs. tit. 8, § 11090, subsection 7 ("Every employer shall keep accurate information with respect to each employee including… [t]ime records showing when the employee begins and ends each work period" and "[t]otal hours worked in the payroll period and applicable rates of pay.").

89.     Foundational Supreme Court precedent going back 70 years holds that employees are entitled to prove damages by "just and reasonable inference" where the employer did not keep complete or adequate records of all compensable work time. *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 455-57 (2016) (quoting *Anderson v. Mt. Clemens Pottery Co*., 328 U.S. 680, 687-88 (1946) for the proposition that: "Instead of punishing 'the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work… an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he proves sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.'"); *Hernandez v. Mendoza* (1988) 199 Cal.App.3d 721, 727 (applying *Mt. Clemens* burden-shifting framework to claims under California state wage law) *Ridgeway*, 946 F.3d at 1086-88; *see also Grimes v. Kinney Shoe Corp.* (D. Alaska 1995) 902 F. Supp. 1070, 1074 (citing *McLaughlin v. Ho Fat Seto* (9th Cir.1988) 850 F.2d 586 and reasoning that the *Mt. Clemens* standard presumes that the employer "should <u>bear the risk that records will be inadequate</u>.") (Emphasis added).[2]

90.     Plaintiffs are entitled to prove any damages not pinpointed by Swift's Macro Data, Swift's Loads Data, Swift's DOT Log Data, and/or Swift's Compensation data, by "just and reasonable inference," using representative evidence. This includes, but is not limited to, expert

---

[2] The same principles apply outside of the timekeeping context where the party resisting estimation is in the position of having access to the most precise evidence. *See, e.g., Trs. of the Operating Eng'rs Pension Tr. v. Nancie's Sweeping, Inc*. (C.D. Cal. Aug. 14, 2009) 2009 U.S. Dist. LEXIS 74554, at *11 (ERISA context); *Villalpando v. Exel Direct Inc.* (N.D. Cal. Apr. 21, 2016) 2016 U.S. Dist. LEXIS 53773, at *31 (expense reimbursement records).

analysis drawing inferences from the data, representative testimony from Drivers regarding the frequency of loaded/non-loaded status, and admissions from Swift's representatives, among other representative evidence.

## DRIVERS REGULARLY LOG TIME SUBJECT TO "HIGH VALUE LOAD" OR "HIGH THEFT AREA" RESTRICTIONS AS "OFF DUTY" OR "SLEEPER BERTH"

91.     Swift does not train, direct or instruct the Drivers that being subject to the "High Theft Area" or "High Value Load" policy means that time should be logged as "On duty."  To the contrary, under Swift's policies, the Drivers are regularly encouraged, suffered and permitted, and required to log this time as "Off duty" or "Sleeper berth," even when they are with a loaded trailer.

92.     To be sure, Swift has a generalized policy to follow DOT regulations in terms of when to log time as "Off duty," "Sleeper berth," and "On duty."  But the DOT regulations do not define "On duty" as including all time an employee is subject to control of the employer.  Rather, the DOT regulations define "On duty" as time spent working or "in readiness to work." 49 C.F.R. § 395.2.  Swift regularly imposes restrictions on the movement or activities of its Drivers even when they are not working or in a readiness to work state.  In fact, Swift regularly imposes restrictions on the movement or activities of its Drivers even when they are prohibited by the DOT Hours of Service regulations from working or being in a readiness to work state.

93.     Unlike the DOT Regulations and in contrast to Swift's policies, California law requires that all time subject to meaningful restrictions on movement or other employer "control" is compensable, not just time when employees are working or in readiness to work. *Ridgeway*, 946 F.3d at 1079-81, 1091.  Thus, there are instances when Drivers must log themselves as "Off duty" to comply with the DOT regulations while they are still subject to employer control (and therefore on-duty) under the applicable wage laws. *Id*. at 1077; *Augustus v. ABM Sec. Servs., Inc*. (2016) 2 Cal. 5th 257, 268, 211; *Mendiola v. CPS Sec. Sols., Inc.* (2015) 60 Cal. 4th 833, 840.

94.     Swift's policies often prohibit Drivers from logging time subject to the "High Value Load" or "High Theft Area" restrictions as "On duty." By way of example, when Drivers have to stop in a High Theft Area because they are coming up against their daily, DOT-mandated 14-hour limit on "On duty" time, both the DOT and Swift strictly prohibit them from logging the time as

"On duty" or being in "a readiness to work." Yet, Swift's "High Value Load" and "High Theft Area" policies meaningfully restrict the Drivers during this time, even though they are by definition not in work readiness. This is a regular occurrence and not at all atypical.

**FIRST CAUSE OF ACTION**
**Failure to Pay for All Hours Worked**
**Pursuant to Labor Code § 201, 202, 204, 221-223, and 226.2; IWC Wage Order No. 9**
**(On Behalf of Plaintiffs and the Putative Class Against Defendants)**

95.    Plaintiffs re-allege and incorporate the foregoing paragraphs as though fully set forth herein.

96.    Labor Code § 200(a) defines wages as "all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis or other method of calculation."

97.    California Labor Code §§ 201 and 202 require an employer to pay all wages earned but unpaid immediately upon the involuntary discharge of an employee or within seventy-two (72) hours of an employee's voluntary termination of employment.

98.    California Labor Code §204 provides that employers must compensate employees for all hours worked "twice during each calendar month, on days designated in advance by the employer as the regular paydays."

99.    California Labor Code §§221 and 223 prohibit employers from withholding and deducting wages, or otherwise artificially lowering the wage scale of an employee.

100.    California Labor Code § 226.2 requires employers who compensate employees on a piece-rate basis to pay employees for nonproductive time subject to employer control, separately from any piece-rate compensation.

101.    As explained above, Defendants have maintained and continue to maintain a policy of denying the Drivers compensation for time logged as "Off duty" and "Sleeper berth," even though Defendants' policies have prevented the Class members from using segments of such time effectively for their own purposes and subjected Class members (including Plaintiffs Fischer, Blazic and Blair) to its control during such time.

102.    In addition, Defendants failed to compensate Drivers for nonproductive time

1  subject to their control logged as "Off duty" and "Sleeper berth," separately from per-mile piece
2  rate compensation.

3      103.    Defendants' unlawful compensation scheme has denied Plaintiffs Fischer, Blazic
4  and Blair and the Class the straight time wages to which they are entitled under the law. As
5  explained above, Plaintiffs Fischer, Blazic and Blair and members of the Class frequently have
6  worked time for which they are not compensated at their regular rates of pay, as determined by
7  the Industrial Welfare Commission.

8      104.    Accordingly, Defendants have artificially reduced the pay rates of Plaintiffs
9  Fischer, Blazic and Blair and members of the Class by denying them compensation for time
10  spent under Defendants' control.

11      105.    In violation of California law, Defendants knowingly and willfully refuse to
12  perform their obligations to provide Plaintiffs and putative Class members with compensation for
13  all time worked.

14      106.    Therefore, Defendants have committed, and continue to commit, the acts alleged
15  herein knowingly and willfully, and in conscious disregard of the Plaintiffs and putative Class
16  members' rights. Plaintiffs and putative Class members are thus entitled to recover nominal,
17  actual, and compensatory damages, plus interest, attorneys' fees, expenses, and cost of suit.

18      107.    As a proximate result of the aforementioned violations, Plaintiffs and putative
19  Class members have been damaged in an amount according to proof at time of trial.

20      108.    Wherefore, Plaintiffs and putative Class request relief as hereinafter provided.

21              **SECOND CAUSE OF ACTION**
22              **Failure to Pay Minimum Wages**
        **Pursuant to Labor Code §§ 226.2, 1182.11, 1182.12, 1194, 1197, and**
23              **1197.1; IWC Wage Order No. 9**
        **(On Behalf of Plaintiffs and the Putative Class Against Defendants)**

24      109.    Plaintiffs re-allege and incorporate the foregoing paragraphs as though fully set
25  forth herein.

26      110.    During the applicable statutory period, California Labor Code Sections 1182.11,
27  1182.12 and 1197 as well as the Minimum Wage Order were in full force and effect and required
28  that the Class members receive the minimum wage for all hours worked at a rate not less than

1  $13.00 per hour from January 1, 2020 to December 31, 2020; at a rate not less than $14 per hour
2  from January 1, 2021 to December 31, 2021; at a rate not less than $15.00 per hour from January
3  1, 2022 to December 31, 2022; at a rate not less than $15.50 per hour from January 1, 2023 to
4  December 31, 2023; and at a rate not less than $16.00 per hour commencing on January 1, 2024.

5      111.    Further, California Labor Code § 226.2 requires employers who compensate
6  employees on a piece-rate basis to pay employees for nonproductive time subject to employer
7  control, separately from any piece-rate compensation.

8      112.    The Drivers are not paid at all—much less at the statutory minimum wage—for
9  extensive time they spend logged as "Off duty" or "Sleeper berth" even though they are subject
10  to Defendants' control and cannot effectively use the time effectively for their own purposes.
11  This time is compensable as a matter of law.

12      113.    In addition, Defendants failed to compensate Drivers for nonproductive time
13  subject to their control logged as "Off duty" and "Sleeper berth," separately from per-mile piece
14  rate compensation.

15      114.    Defendants' unlawful compensation scheme has denied Plaintiff Morrison,
16  Plaintiff Loper, and the putative Class the minimum wages to which they are entitled under the
17  law.  As explained above, Plaintiffs and members of the putative Class routinely have been
18  subject to Defendants' control without pay and performed work for which they are not
19  compensated even at the statutory minimum wage, as determined by the IWC.

20      115.    California Labor Code Section 1194.2 provides that, in any action under Section
21  1194 to recover wages because of the payment of a wage less than minimum wage fixed by an
22  order of the commission, an employee shall be entitled to recover liquidated damages in an
23  amount equal to the wages unlawfully unpaid and interest thereon.

24      116.    Under California Labor Code Section 218.6 and Civil Code Section 3287(a),
25  Plaintiffs Fischer, Blazic and Blair, and other members of the putative Class, are entitled to
26  recover pre-judgment interest on wages earned, but not paid every pay period.

27      117.    As a direct and proximate result of the unlawful acts and omissions of Defendant,
28  Plaintiffs Fischer, Blazic and Blair, and members of the putative Class, have been deprived of

minimum wages in an amount to be determined at trial, and are entitled to a recovery of such

amount, plus liquidated damages, plus interest thereon, attorneys' fees, and costs of suit under

California Labor Code Sections 1194, 1194.2 and 1197.1.

**THIRD CAUSE OF ACTION**

**Failure to Provide Accurate Itemized Wage Statements**
**Pursuant to Labor Code §§ 226, 226.3 and 226.6**
**(On Behalf of Plaintiffs and Putative Class Against Defendants)**

118.    Plaintiffs re-allege and incorporate the foregoing paragraphs as though fully set

forth herein.

119.    Defendants do not provide Plaintiffs and putative Class members with accurate

itemized wage statements as required by California law.

120.    Labor Code § 226(a) provides:

> Every employer shall, semimonthly or at the time of each payment
> of wages, furnish each of his or her employees, either as a detachable
> part of the check, draft, or voucher paying the employee's wages, or
> separately when wages are paid by personal check or cash, an
> accurate itemized statement in writing showing (1) gross wages
> earned, (2) total hours worked by the employee, except for any
> employee whose compensation is solely based on a salary and who
> is exempt from payment of overtime under subdivision (a) of Section
> 515 or any applicable order of the Industrial Welfare Commission,
> (3) the number of piece-rate units earned and any applicable piece
> rate if the employee is paid on a piece-rate basis, (4) all deductions,
> provided that all deductions made on written orders of the employee
> may be aggregated and shown as one item, (5) net wages earned, (6)
> the inclusive dates of the period for which the employee is paid, (7)
> the name of the employee and his or her social security number, (8)
> the name and address of the legal entity that is the employer, and (9)
> all applicable hourly rates in effect during the pay period and the
> corresponding number of hours worked at each hourly rate by the
> employee.  The deductions made from payments of wages shall be
> recorded in ink or other indelible form, properly dated, showing the
> month, day, and year, and a copy of the statement or a record of the
> deductions shall be kept on file by the employer for at least four years
> at the place of employment or at a central location within the State of
> California.

121.    The IWC Wage Orders also establish this requirement.  (See IWC Wage Orders

9-2001(6))

122.    Labor Code § 226.3 provides, in relevant part:

Any employer who violates subdivision (a) of Section 226 shall be subject to a civil penalty in the amount of two hundred fifty dollars ($250) per employee per violation in an initial citation and one thousand dollars ($1,000) per employee for each violation in a subsequent citation, for which the employer fails to provide the employee a wage deduction statement or fails to keep the records required in subdivision (a) of Section 226.

123.    Labor Code 226.6 provides, in relevant part:

Any employer who knowingly and intentionally violates the provisions of Section 226, or any officer, agent, employee, fiduciary, or other person who has the control, receipt, custody, or disposal of, or pays, the wages due any employee, and who knowingly and intentionally participates or aids in the violation of any provision of Section 226 is guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than one thousand dollars ($1,000) or be imprisoned not to exceed one year, or both, at the discretion of the court.

124.    Labor Code § 226(e) provides:

An employee suffering injury as a result of a knowing and intentional failure by an employer to comply with subdivision (a) is entitled to recover the greater of all actual damages or fifty dollars ($50) for the initial pay period in which a violation occurs and one hundred dollars ($100) per employee for each violation in a subsequent pay period, not exceeding an aggregate penalty of four thousand dollars ($4,000) and is entitled to an award of costs and reasonable attorney's fees.

125.    Defendants do not provide timely, accurate itemized wage statements to Plaintiffs and putative Class members in accordance with Labor Code § 226(a) and the IWC Wage Orders. The wage statements Defendants provide their employees, including Plaintiffs and Class members, do not accurately reflect all hours actually worked, actual gross wages earned or actual net wages earned, including minimum wages, as a result of the failure to pay for time resulting from violations described herein.

126.    Defendants' failure to provide accurate itemized wage statements as described above is knowing and intentional. Defendants knowingly and intentionally use standardized wage statements and knowingly and intentionally determine what information to provide on these statements to all Drivers. Further, Defendants have been on notice of the violations alleged

herein from previous litigation and have not modified their policies or wage statements to address the violations.

127. Plaintiffs and the Drivers have suffered injury as a result of Defendants' failure to provide accurate itemized wage statements. For example, the inaccurate and incomplete information on the wage statements has prevented Plaintiffs and the Drivers from promptly and easily determining, from the wage statements alone, their actual gross wages, total hours worked, number of piece-rate units earned and the applicable piece rate actually paid, net wages earned, and all applicable hourly rates in effect.

128. Defendants are liable to Plaintiffs and the putative Class members for the amounts described above in addition to the civil penalties set forth below, with interest thereon. Furthermore, Plaintiffs are entitled to an award of attorneys' fees and costs as set forth below, pursuant to Labor Code § 226(e).

129. Wherefore, Plaintiffs and the putative Class request relief as hereinafter provided.

**FOURTH CAUSE OF ACTION**
**Waiting time Penalties**
**Pursuant to Cal. Lab. Code §§ 201-203**
**(On Behalf of Plaintiffs and Putative Class Against Defendants)**

130. Plaintiffs reallege and incorporate the foregoing paragraphs as though fully set forth herein.

131. Defendants have not provided Class Members with wages due under California law after their employment with Defendants ends.

132. Cal. Lab. Code § 201 provides: "If an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately."

133. Cal. Lab. Code § 202 provides:

If an employee not having a written contract for a definite period quits his or her employment, his or her wages shall become due and payable not later than 72 hours thereafter, unless the employee has given 72 hours previous notice of his or her intention to quit, in which case the employee is entitled to his or her wages at the time of quitting.

134. Cal. Lab. Code § 203 provides, in relevant part:

If an employer willfully fails to pay, without abatement or reduction, in accordance with Sections 201, 201.5, 202, and 205.5, any wages of an employee who is

29

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
*Fischer, et al. v. Swift Transportation Co. of Arizona, LLC, et al.*

discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days.

135.   Plaintiffs and members of the putative Class left their employment with Defendants during the statutory period, at which time Defendants owed them unpaid wages. These earned, but unpaid, wages derive from time spent working for the benefit of Defendants during missed or interrupted meal periods, and/or missed second meal periods.

136.   Defendants have willfully refused and continue to refuse to pay Plaintiffs and putative Class members all the wages that are due and owing to them for the work performed. As a result of Defendants' actions, Plaintiffs and Class Members have suffered and continue to suffer substantial losses, including lost earnings and interest.

137.   Defendants' willful failure to pay Plaintiffs and putative Class members the wages due and owing them constitutes a violation of Cal. Lab. Code §§ 201-202. As a result, Defendants are liable to Plaintiffs and proposed Class members for all penalties owing pursuant to Cal. Lab. Code §§ 201-203.

138.   In addition, addition, Cal. Lab. Code § 203 provides that an employee's wages will continue as a penalty up to thirty days from the time the wages were due. Therefore, the Plaintiffs and putative Class members are entitled to penalties pursuant to Cal. Lab. Code § 203, plus interest.

139.   Wherefore, Plaintiffs and putative Class members request relief as hereinafter provided.

## FIFTH CAUSE OF ACTION
### Violation of California Business and Professions Code §§ 17200 *et seq.*
### (On Behalf of Plaintiffs and Putative Class Against Defendants)

140.   Plaintiffs reallege and incorporate the foregoing paragraphs as though fully set forth herein.

141.   California Business and Professions Code Section 17200 defines unfair competition to include, "unlawful, unfair or fraudulent business practices."

142.   Plaintiffs Fischer, Blazic and Blair, and all proposed members of the Class, are "persons" within the meaning of California Business and Professions Code Section 17204, who

have suffered injury in fact and have lost money or property as a result of Defendants' unfair competition.

143.    Defendants have been committing, and continue to commit, acts of unfair competition by engaging in the unlawful and unfair business practices and acts described in this Complaint, including, but not limited to:

      i.    violations of Labor Code §§ 1182.11, 1182.12, 1194, 1197, 1197.1, 1198, and IWC Wage Order 9-2001 pertaining to payment of wages, including minimum wage, for all hours worked;

      ii.    violations of Labor Code §§ 226, 226.3 and 226.6 regarding accurate, timely itemized wage statements; and

      iii.    violations of Cal. Lab. Code §§ 201-203 pertaining to payment of all wages owed during employment and following separation from employment

144.    The violations of these laws and regulations, as well as of the fundamental California public policies protecting wages, are unlawful predicate acts and practices for purposes of Business and Professions Code §§ 17200 et seq.

145.    The acts and practices described above constitute unfair, unlawful, and fraudulent business practices, and unfair competition, within the meaning of Business and Professions Code §§ 17200 et seq.  Among other things, the acts and practices have taken from Plaintiffs and the putative Class wages rightfully earned by them, while enabling Defendants to gain an unfair competitive advantage over law-abiding employers and competitors.

146.    Business and Professions Code § 17203 provides that a court may make such orders or judgments as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition.  Injunctive relief is necessary and appropriate to prevent Defendants from repeating the unlawful, unfair, and fraudulent business acts and practices alleged above.

147.    As a direct and proximate result of the aforementioned acts and practices, Plaintiffs and putative Class members have suffered a loss of money and property, in the form of unpaid wages, which are due and payable.

148.    Business and Professions Code § 17203 provides that the Court may restore to any person in interest any money or property which may have been acquired by means of such unfair competition.  Plaintiffs and putative Class members are entitled to restitution pursuant to Business and Professions Code § 17203 for all wages and payments unlawfully withheld from employees during the four-year period prior to the filing of this Complaint.  Plaintiffs' success in this action will enforce important rights affecting the public interest and, in that regard, Plaintiffs sue on behalf of themselves as well as others similarly situated.  Plaintiffs and putative Class members seek and are entitled to unpaid wages, declaratory and injunctive relief, and all other equitable remedies owed to them.

149.    Plaintiffs herein take upon themselves enforcement of these laws and lawful claims.

150.    There is a financial burden involved in pursuing this action, the action is seeking to vindicate a public right, and it would be against the interests of justice to penalize Plaintiffs by forcing them to pay attorneys' fees from any recovery thereof.  Attorneys' fees are appropriate pursuant to Code of Civil Procedure § 1021.5 and otherwise.

151.    Wherefore, Plaintiffs and the putative Class request relief as hereinafter provided.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

a.    That the Court determine that this action may be maintained as a class action under Federal Rule of Civil Procedure 23;

b.    For an order appointing Plaintiffs as representatives of the Class;

c.    For an order appointing Plaintiffs' attorneys as Class Counsel;

d.    Damages and restitution according to proof at trial for all unpaid wages and other injuries, as provided by the California Labor Code and California Business and Professions Code;

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
*Fischer, et al. v. Swift Transportation Co. of Arizona, LLC, et al.*

e.    For a declaratory judgment that Defendants have violated the California Labor Code, California law, and public policy as alleged herein;

f.    For a declaratory judgment that Defendants have violated California Business and Professions Code §§ 17200 *et seq.*, as a result of the aforementioned violations of the California Labor Code;

g.    For preliminary, permanent, and mandatory injunctive relief prohibiting Defendants, their officers, agents, and all those acting in concert with them from committing in the future those violations of law herein alleged;

h.    For an equitable accounting to identify, locate, and restore to all current and former employees the wages they are due, with interest thereon;

i.    For an order awarding Plaintiffs and putative Class members compensatory damages, including lost wages, earnings, liquidated damages, and other employee benefits, restitution, recovery of all money, actual damages, treble damages, punitive damages, and all other sums of money owed to Plaintiffs and putative Class members, together with interest on these amounts, according to proof;

j.    For an award of reasonable attorneys' fees as provided by the California Labor Code, including California Code of Civil Procedure § 1021.5 and/or other applicable law;

k.    For all costs of suit;

l.    For interest as provided by applicable law; and

m.    For such other and further relief as this Court deems just and proper.

Respectfully submitted,

Dated: May 23, 2025

**SCHNEIDER WALLACE COTTRELL KONECKY LLP**

Nathan B. Piller
Frank J. White Jr.
2000 Powell Street, Suite 1400

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
*Fischer, et al. v. Swift Transportation Co. of Arizona, LLC, et al.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Emeryville, CA 94608
Tel: (415) 421-7100; Fax: (415) 421-7105
jkonecky@schneiderwallace.com
npiller@schneiderwallace.com
fwhite@schneiderwallace.com

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
*Fischer, et al. v. Swift Transportation Co. of Arizona, LLC, et al.*

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all claims and issues for which Plaintiff is entitled to a jury.

Dated: May 23, 2025

**SCHNEIDER WALLACE
COTTRELL KONECKY LLP**


Nathan B. Piller
Frank J. While
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Tel: (415) 421-7100; Fax: (415) 421-7105
npiller@schneiderwallace.com
fwhite@scheiderwallace.com